## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 22 2017, 6:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jeffrey E. Kimmell
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Alberto Cruz,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 22, 2017

Court of Appeals Case No.
71A03-1606-CR-1492

Appeal from the St. Joseph
Superior Court

The Honorable John M.
Marnocha, Judge

Trial Court Cause No.
71D02-1505-MR-3

**Robb, Judge.**

# Case Summary and Issue

[1] Following a jury trial, Alberto Cruz was convicted of murder. Cruz now appeals, raising the sole issue of whether the State presented sufficient evidence to support his conviction. Concluding the State presented sufficient evidence to support his conviction, we affirm.

# Facts and Procedural History

[2] Alberto Cruz and Alma Del Real became acquainted with each other in 2013, and had been friends ever since. Their relationship was not romantic, and Alma considered Cruz to be just a friend. Around 11:00 p.m. on Saturday, April 11, 2015, Cruz picked Alma up at her house and the pair went to Brothers Bar & Grill in South Bend, Indiana. Unbeknownst to Cruz, Alma had invited other friends to the bar as well, including a man with whom she had a "budding relationship," Edgar Medina. Transcript at 229. According to Medina, Cruz was not very sociable that evening and he felt like Cruz had no desire to speak to him.

[3] Alma had also planned on meeting her friend, Dejah Browning, at Brothers. Dejah arrived at Brothers a little after midnight and shortly thereafter, Cruz, Alma, Medina, and Dejah decided to continue their night at a dance club, Studio Rumba's. Alma previously worked at Studio Rumba's and was well acquainted with the staff and security personnel. Upon arrival, Alma greeted Eric Laudeman, a police officer for the City of Mishawaka who often works as

a security guard at Studio Rumba's. Officer Laudeman noted Cruz seemed angry the entire night. As Alma would go around the room and converse with different people, Cruz stood behind her scowling and giving dirty looks. Officer Laudeman considered it "very awkward" and was "expecting a problem." *Id.* at 200. As the night progressed, Alma pulled Dejah into the bathroom to ask for advice about Cruz. According to Dejah, Alma asked her for advice about Cruz because "he kept wanting to further their friendship into a relationship, and she didn't want that." *Id.* at 212. Dejah advised Alma to "just tell him how you feel." *Id.* At 3:00 a.m., Cruz and Alma left Studio Rumba's in Cruz's truck.

[4] The next morning, Alma was supposed to drive to Chicago with her friend and business partner, Crystal Rangel, but Alma never showed up. Rangel attempted to call Alma multiple times and drove to her house and knocked on the door, but she received no response. As the day progressed, Alma's family became increasingly worried about her, as she often responded rapidly to phone calls and texts. Alma's aunt also tried to contact her friends to ask if they had heard from her, but she had no luck.

[5] On Monday, April 13, 2015, Alma's aunt filed a missing person's report with the South Bend Police Department. Later that day, Officer Sienna Valdez spoke with Cruz at the police station to inquire about Alma's disappearance. Cruz told Officer Valdez he dropped Alma off at her home shortly after leaving Studio Rumba's, drove home, and went to bed. On April 15, Officer Jennifer Gobel interviewed Cruz. Cruz generally repeated the same story he told Officer

Valdez, although this time he added Alma had danced with an "unknown Brazilian person" at Studio Rumba's. *Id.* at 281. Cruz also stated he received a Facetime call from Alma around 3:44 a.m. as he was driving home, which he declined to answer.

[6] On May 18, 2015, Officer Gobel and F.B.I. Special Agent Tom Weber interviewed Cruz for a third time. Cruz repeated the same story he told earlier, although Officer Gobel recognized a discrepancy. This time, Cruz stated he missed Alma's Facetime call, not that he declined it. On May 20, Officer Gobel and Agent Weber interviewed Cruz again and confronted him with evidence he was not telling the truth. A search warrant executed on Cruz's phone showed on the morning of April 12, 2015, Cruz was not asleep in his bed as he claimed. The cellular data and location services collected from Cruz's phone showed Cruz's phone remained connected to a cellular tower that encompassed an area that included Alma's home and Studio Rumba's, but not Cruz's home, from 2:11 a.m. to 6:33 a.m. From 6:33 a.m. to 9:45 a.m., Cruz's phone connected to several other cellular towers in a path leading south out of South Bend and ending near Lake Maxincuckee in Culver, Indiana. Cruz continued to deny he left South Bend and remained steadfast in his assertion he was asleep in bed with his phone in his room.

[7] After several hours of denial, Cruz requested to speak to Agent Weber alone, a discussion Agent Weber later detailed at trial:

> [Agent Weber]: In the first story, he told me that either her or her family owed a lot of money to a Mexican

cartel.  And that the Latin Kings that were connected with the Mexican cartel, were waiting for Alma when he dropped her off.  They grabbed Alma and told him just to leave.  Which he then said that he walked home.  Then he said he woke up the next morning, looked down the street and saw his truck parked just down the street.

* * *

[State]:  And what did his story evolve to from there?

[Agent Weber]:  I confronted him of the unlikelihood of that story being true.  And then he changed and went on to several other stories.  One story was that he saw someone . . . or that someone had drugged him . . . or given Alma a rophy [sic], and then he watched as that person carried her out of the house.  Another story was that he tried to accuse the ex-boyfriend.  He said that when they got to Alma's house the ex-boyfriend was waiting there . . . [a]nd he could only assume that the ex-boyfriend had something to do with it.

* * *

[State]:  Did he tell you anything else on that day?

[Agent Weber]:  Yes, he told me that he stayed at the house a little while with Alma and they just talked, it was just the two of them.  Then they told me that she was at a barn, that somebody had taken her to a barn.

[State]:  And did you confront him about that story?

[Agent Weber]:  Yes, I told him it was very unlikely that that's what really occurred.  Then he admitted to me that he had just been lying to me, because he didn't know what to say.

*Id.* at 360-62.  Agent Weber then asked Cruz if he knew where Alma was, to which he responded he did and he could take Agent Weber there.  As they left the police station, Cruz directed them on a forty-five-minute drive south, stopping on a dirt road outside of Culver.  Cruz pointed into the woods and stated, "[s]he's right out there."  *Id.* at 364.  A short distance from the road, Agent Weber found Alma's body.  When they returned to the police station, the interview continued.

| [State]: | So what did he tell you at Metro Homicide? |
|---|---|
| [Agent Weber]: | Well, first he told me that he did take the body down there, but he was directed by a South American.  His story was when they left the bar, they want [sic] to Alma's house.  And that this guy he didn't know, other than a South American, was there waiting.  Then Alma and the South American went up to her bedroom and Mr. Cruz stayed in the living room and fell asleep on the couch.  Then at some point he was woken up from a big thump coming from Alma's bedroom.  He ran up to the room and saw the South American on top of Alma strangling her. |

\* \* \*

| [State]: | Did he come off of that story? |
|---|---|
| [Agent Weber]: | Eventually he did, yes. |
| [State]: | And what did he tell you then? |
| [Agent Weber]: | He eventually told me that he was the one who actually . . . that he hit her, and that he did strangle her. |

*Id.* at 365-66. Cruz also told Agent Weber when he and Alma arrived at her house, they had "rough sex" which was consensual. Exhibit 48 at 62:36. Cruz claimed Alma attempted to blackmail him after they had sex and stated she would tell the police he raped her unless he paid her five to ten thousand dollars. When he tried to leave, she began to scratch, shove, and punch him. He became angry and hit her twice in the face and shoved her to the ground. He claimed when she fell, she hit the back of her head on the hardwood floor and remained unresponsive. Cruz claimed he checked Alma for a pulse and felt nothing, so he put his hands around her neck until he left handprints in an attempt to cover up his accident.

[8]     On May 22, 2015, the State charged Cruz with murder. At trial, Dr. Elizabeth Douglas, the forensic pathologist who examined Alma's body, stated that due to the decomposition of the body she could not verify the cause of death; however, the circumstances were sufficiently suspicious to warrant a ruling of homicide. She stated she ruled out natural causes and blunt trauma to the liver, kidneys, and lungs, although she could not rule out strangulation as a cause of death. Dr. Douglas further stated after examining Alma's skull, she did not identify any injuries to her head. When asked if a fall stemming from a shove could inflict fatal injury, she stated, "[i]f the force imparted was great enough to inflict lethal head trauma, I would expect to see skeletal injuries with it. It's possible that they wouldn't be there, but in general, if you're going to have a subdural in a young person, that's usually accompanied by a skull fracture." *Id.* at 392. The State also offered the testimony of Zachary Gadacz, who met Cruz

in a holding cell while awaiting an arraignment. Gadacz stated Cruz told him he choked Alma because "she rejected him sexually." *Id.* at 422. When he asked Cruz if it was worth it, he stated, "[e]very last second of it." *Id.* at 423.

[9] Cruz also testified at trial and stuck to his same general story but added some minor changes. Cruz testified he and Alma returned to her house after leaving Studio Rumba's and recapped the evening. As he walked downstairs to leave, he received a Facetime call from Alma, which he declined to answer. As he returned upstairs to see why she called him, he claimed she began kissing him and they had sexual intercourse. After, as he got dressed to leave, he claimed Alma told him he owed her money, which he first assumed was a joke. He attempted to leave, but Alma began punching, pushing, and scratching him. Cruz then stated he became angry and punched her twice in her face and shoved her to the ground as hard as he could. Cruz also stated when he choked Alma, he thought she was already dead. When asked how telling the police he choked her after he thought she was dead would help him, Cruz stated, "I was just . . . just saying stuff. I mean . . . it was too much pressure." *Id.* at 507.

[10] A jury found Cruz guilty of murder.[1] Cruz now appeals.

# Discussion and Decision

---

[1] The jury was instructed on murder, voluntary manslaughter, and reckless homicide.

[11] Cruz challenges the sufficiency of the evidence to support his murder conviction. The standard of review for sufficiency of the evidence claims is well settled. We do not reweigh the evidence or judge the credibility of the witnesses, and we respect "the jury's exclusive province to weigh conflicting evidence." *Alkhalidi v. State*, 753 N.E.2d 625, 627 (Ind. 2001). We "consider only the probative evidence and reasonable inferences supporting the verdict." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We will affirm a conviction "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *Tobar v. State*, 740 N.E.2d 109, 111-12 (Ind. 2000).

[12] To convict Cruz of murder, the State was required to prove beyond a reasonable doubt that he knowingly or intentionally killed Alma. Ind. Code § 35-42-1-1(1). A person's conduct is intentional if, when he engages in the conduct, it is his "conscious objective to do so." Ind. Code § 35-41-2-2(a). A person acts knowingly if, when he engages in the conduct, he is "aware of a high probability that he is doing so." Ind. Code § 35-41-2-2(b).

[13] Cruz asserts the evidence is insufficient to support his conviction because "[t]he State did not produce any evidence suggesting that it was [Cruz's] conscious objective to kill [Alma]. Nor did the State produce any evidence that there was a high probability that [Alma] could die as a result of [Cruz] punching her and pushing her to the ground." Brief of Appellant-Defendant at 13. Cruz's argument proceeds on the assumption the jury believed his testimony Alma died from being punched and shoved to the ground. The jury was not required

to believe or give weight to this testimony, and given the numerous lies, half-truths, and versions of events told by Cruz, it is not surprising it did not.

[14] Further, we note it is well-established knowledge or intent may be inferred from the facts and circumstances of the case. *Johnson v. State*, 837 N.E.2d 209, 214 (Ind. Ct. App. 2005), *trans. denied*. The evidence supporting the verdict shows that on April 11, 2015, Cruz and Alma went out with friends. Cruz was in an unsociable and unpleasant mood whenever Alma would talk to other people at the bar. At one point in the evening, Alma asked her friend for advice on what to do about Cruz because he wanted to transform their friendship into a relationship and she did not. When the night was over, Cruz drove Alma back to her home and was the last one to see her alive. A month later, following several interviews and a number of lies told to the police, Cruz finally admitted he punched Alma twice in the face, shoved her to the ground, choked her until his handprints were visible on her neck, and dumped her body in a woods out of town. In subsequent interviews with police, Cruz repeatedly referenced strangling, choking, or placing his hands on Alma's neck after he shoved her to the ground. Cruz then led police to where he dumped Alma's body in the woods near Culver. Dr. Douglas could not pinpoint a cause of death due to decomposition of the body, but she could not rule out strangulation. And while Cruz claims Alma died after he punched her and shoved her to the ground, Dr. Douglas stated she found no injuries to Alma's skull, as she would expect to find in a fatal head injury. We conclude the State presented sufficient evidence

for a jury to conclude beyond a reasonable doubt Cruz knowingly or intentionally killed Alma.

[15] Cruz also claims he acted in sudden heat, and as such, his conviction should be reduced to voluntary manslaughter. A person who knowingly or intentionally kills another human being while acting under sudden heat commits voluntary manslaughter. Ind. Code § 35-42-1-3(a)(1). "Sudden heat" is characterized as "anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Dearman v. State*, 743 N.E.2d 757, 760 (Ind. 2001). The existence of sudden heat is a question of fact to be determined by the jury. *Jackson v. State*, 709 N.E.2d 326, 329 (Ind. 1999). Cruz asserts he acted in sudden heat when he struck Alma and shoved her to the ground because she demanded money after they had sex and attacked him when he refused. The only testimony supporting this version of events is Cruz's own testimony, which the jury was entitled to credit and weigh. The jury either concluded Cruz's story was not credible, or his version of events did not rise to the level of sudden heat. Either way, this determination was for the jury to make, and we cannot reweigh the evidence or assess witness credibility on appeal. *Alkhalidi*, 753 N.E.2d at 627.

# Conclusion

[16] We conclude the State presented sufficient evidence to support Cruz's conviction for murder. Accordingly, we affirm his conviction.

Affirmed.

Kirsch, J., and Barnes, J., concur.